**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MYLAN, INC., and MYLAN INSTITUTIONAL, LLC, | ) | Civil Action No. 2:12-cv-80 |
|  | ) |  |
| Plaintiffs, | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
|  | ) |  |
| v. | ) |  |
|  | ) | ECF No. 3 |
| GEORGE ZORICH, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## OPINION

LENIHAN, Chief Magistrate Judge

This action arises from the alleged breach of non-competition and non-solicitation provisions contained in a Consulting Agreement entered into between Plaintiff, Mylan, Inc., and Defendant, George Zorich. Currently pending before the Court is Plaintiffs' Motion for Remand (ECF No. 3). In support of this motion, Plaintiffs argue that Zorich improperly removed this action from the Court of Common Pleas of Washington County based upon diversity of citizenship because Plaintiff Mylan Institutional LLC and Defendant Zorich are both citizens of Illinois, and Zorich cannot show that Mylan Institutional was fraudulently joined. For the reasons set forth below, the Court will Grant Plaintiff's Motion for Remand.

## I.    BACKGROUND & PROCEDURAL HISTORY

The relevant facts, which the Court accepts as true for purposes of deciding the motion to

remand,[1] are as follows. Mylan, Inc. ("Mylan"), is a Pennsylvania corporation located in Canonsburg, Pennsylvania, and is the second largest generic pharmaceutical company in the United States. (Compl. ¶1, ECF No. 1-2.) Mylan Institutional LLC ("Mylan Institutional") is a Delaware limited liability company with its headquarters located in Rockford, Illinois. (*Id.* at ¶2.) Mylan Institutional, a subsidiary of Mylan (*Id.* at ¶10), is a customer-focused business providing a variety of pharmaceutical products and services to institutional customers (*Id.* at ¶2).

At all relevant times, Defendant George Zorich ("Zorich" or "Defendant") resided in or near Chicago, Illinois. (*Id.* at ¶¶ 3, 35.) In 2006, Zorich was hired by Bioniche Pharma USA LLC ("Bioniche") as President of its North American operations. (*Id.* at 7.) Bioniche was an Illinois based pharmaceutical company specializing in difficult to formulate and manufacture injectable drugs. (*Id.* at ¶6.)

On July 14, 2010, Mylan acquired Bioniche, which became a part of Mylan Institutional. (*Id.* at ¶10.) Mylan Institutional currently conducts the business of Bioniche. (*Id.*) At the time of the acquisition of Bioniche, Zorich was president of Bioniche's North American operations. As part of the share purchase agreement ("SPA") executed by Bioniche and Mylan, certain specified employees of Bioniche, including Zorich, agreed to enter into consulting agreements with Mylan. (*Id.* at ¶11.) Zorich's promise to enter into a consulting agreement with Mylan, in part, induced Mylan to execute the SPA. (*Id.*) In return for Zorich's promise to enter into a consulting agreement and in concert with the acquisition, Mylan (or Bioniche at Mylan's direction) agreed to provide Zorich with a cash bonus and permission to exercise Bioniche stock

---

[1] In evaluating the fraudulent joinder exception to complete diversity of citizenship, the court is required to focus on the complaint at the time the notice of removal was filed, and must assume that all factual allegations in the complaint are true. *In re Briscoe,* 448 F.3d 201, 217 (3d Cir. 2006) (citing *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 851-52 (3d Cir. 1992)).

options which Mylan agreed to purchase at a premium, as well as additional consideration set forth in the Consulting Agreement entered into on July 14, 2010, between Mylan and Zorich. (*Id.* at ¶¶12-13; Ex. A to Compl., ¶3.)

Under the Consulting Agreement, Zorich's services consisted of devoting his "full working time and attention to the business and affairs of [Mylan] and its affiliate companies and subsidiaries (collectively, the "Mylan Companies") and . . . to serve [Mylan] faithfully and to the best of [his] ability, and use [his] best efforts to promote the interests of the Mylan Companies." (Compl., ¶¶19, 26; Ex. A to Compl., ¶1.) In connection with these services, Zorich gained access to the confidential and trade secret information of Mylan.

Pursuant to paragraph 5 of the Consulting Agreement, Zorich agreed that for 24 months after the termination of the agreement, he would not become employed or associated with any person, corporation or other entity engaged in research, development, manufacturing, production, marketing, promotion or sale of any product the same as or similar to those of the Mylan Companies, or which competes with any line of business with the Mylan Companies. (Ex. A to Compl. at ¶5(a).) Zorich also agreed not to solicit, divert or take away any customers or suppliers of Mylan Companies or to contact same for such purposes. (Ex. A to Compl. at ¶5(b).) In addition, Zorich agreed not to solicit, hire or otherwise induce any employee of Mylan Companies to leave for any reason. (Ex. A to Compl. ¶5(c).) The Consulting Agreement was extended by the parties and eventually terminated in June of 2010. (Compl., ¶17.)

Mylan believes that Zorich has breached the non-compete provision of the Consulting Agreement. Sometime prior to January 10, 2012, it is believed that Zorich joined a competitor of Mylan, W.G. Critical Care, as its chief executive officer. (Compl., ¶¶30-31.) According to a description of its services in the trademark application filed with the United States Patent and

Trademark Office, W.G. Critical Care offers a "full line of injectable generic pharmaceutical preparations." (*Id.* at ¶32.) Mylan believes that Zorich continues to live and work for W.G. Critical Care in Illinois. (*Id.* at ¶35.)

Mylan Institutional derives a sizeable amount of its business from the market for generic injectables and these products comprise a substantial component of the marketplace in which Mylan Institutional does business. (Compl., ¶33.) Mylan Institutional operates the entity acquired by Mylan from Zorich's former employer, Bioniche. (*Id.*) The majority of Zorich's consulting duties under the Consulting Agreement involved work for Mylan Institutional. (*Id.*) Mylan believes that Zorich is serving in an executive capacity for W.G. Critical Care that is substantially similar to the capacity in which he worked for Bioniche and later provided through consulting services to Mylan. (*Id.* at ¶34.)

Mylan further believes that Zorich breached the non-solicitation provision in paragraph 5 of the Consulting Agreement by soliciting Michael Bohling, former director of sales operations at Mylan Institutional, to join W.G. Critical Care as vice president of sale operations, where he would be working to market products including generic injectables.[2] (*Id.* at ¶¶36-37.) As director of sales operations at Mylan Institutional, Bohling was privy to Mylan's confidential, propriety, and trade secret information. (*Id.* at ¶39.) Prior to his resignation from Mylan Institutional, Bohling downloaded nearly 40 gigabytes of proprietary and confidential data, including Mylan Institutional's largest share drive. (*Id.* at ¶¶37, 41.)

Consequently, on or about January 19, 2012, Mylan and Mylan Institutional sought injunctive relief for breach of the Consulting Agreement by filing the instant lawsuit in the Court

---

[2] Mylan believes that Zorich solicited a second Mylan employee, Kara Maxwell, to leave Mylan and join W.G. Critical Care. (Compl., ¶43.)

of Common Pleas of Washington County, Pennsylvania ("common pleas court" or "state court"). (Notice of Removal at ¶1, ECF No. 1.)  On that same date, Plaintiffs filed an *ex parte* motion for special injunction and expedited discovery, and the common pleas court entered a temporary order enjoining Zorich from being employed by W.G. Critical Care and soliciting Plaintiffs' employees; directing Zorich to preserve documents/information related to the litigation and to return any of Plaintiffs' confidential, proprietary, and trade secret information; and granting Plaintiffs leave to conduct expedited discovery.  (Ex. C attached to Notice of Removal, ECF No. 1-4.)  The common pleas court also ordered that a hearing on the request for preliminary injunction would be held on January 24, 2012.  (*Id.*)  However, before that hearing could take place, Zorich filed a timely Notice of Removal, pursuant to 28 U.S.C. §1441(a), thereby removing the instant action to this Court on January 24, 2012.

In support of his removal petition, Zorich submits that this Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.  (Notice of Removal at ¶6.)  Zorich contends that although Mylan Institutional is a citizen of Illinois (by virtue of its principal place of business being located in Illlinois),[3] as well as Zorich, Mylan Institutional was misjoined as a plaintiff because (1) it is not a party to the Consulting Agreement, and thus, lacks standing to bring this lawsuit, and (2) it was not an intended third party beneficiary of the Consulting Agreement.  (*Id.* at ¶¶9-

---

[3] Zorich further asserts that Mylan Institutional is a citizen of Delaware because it is a Delaware limited liability company.  Zorich is incorrect.  For diversity purposes, the citizenship of a limited liability company is determined by the citizenship of each of its members.  *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412, 419-20 (3d Cir. 2010).  Zorich does not identify the members of Mylan Institutional in his Notice of Removal.  However, in light of this Court's ruling *infra* that Mylan Institutional was fraudulently joined as a Plaintiff, and therefore will be dismissed as a party plaintiff, Zorich need not establish the citizenship of the members of Mylan Institutional.

11.) Therefore, under the doctrine of fraudulent joinder, Zorich maintains that the citizenship of Mylan Institutional must be disregarded for purposes of determining diversity. When Mylan Institutional's citizenship is disregarded, Zorich contends complete diversity exists.

In response, Plaintiffs filed a motion to remand this action to state court on January 25, 2012 (ECF No. 3), arguing that under Pennsylvania law, Mylan Institutional is an intended third party beneficiary under the Consulting Agreement, and therefore, complete diversity does not exist. The Court set an expedited briefing schedule on the motion to remand. The motion and response in opposition have been fully briefed. Thus, the motion to remand is ripe for disposition.

## II.     LEGAL STANDARD – REMOVAL & MOTION TO REMAND

Section 1441 of Title 28, United States Code, governs the removal of a case to federal court. Generally, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . , to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. §1441(a). "The removal statutes 'are to be strictly construed against removal and all doubts should be resolved in favor of remand.'" *Boyer v. Snap-On Tools Corp.,* 913 F.2d 108, 111 (3d Cir. 1990) (quoting *Steel Valley Auth. v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir. 1987) (other citations omitted)); *Sikirica v. Nationwide Ins. Co.,* 416 F.3d 214, 219 (3d Cir. 2005). Where a motion for remand is filed, the defendant has the burden of proving that removal was proper. *Sikirica,* 416 F.3d at 219 (citing *Samuel-Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392, 396 (3d Cir. 2004)).

When a state court action has been removed to federal court based on diversity of citizenship, as in the present case, complete diversity of citizenship of the parties must exist and

none of the defendants may be a citizen of the forum state. 28 U.S.C. §1441(b); *In re Briscoe,* 448 F.3d 201, 215 (3d Cir. 2006) (citation omitted). The doctrine of fraudulent joinder provides an exception to this rule. *In re Briscoe,* 448 F.3d at 215-16 (citation omitted). In order for this exception to apply and thus provide a basis for this Court's subject matter jurisdiction, the removing party must "establish that the non-diverse [party was] 'fraudulently' named or joined solely to defeat removal jurisdiction." *Id.* at 216. If a court concludes that a party was fraudulently joined, "the court can 'disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction.'" *Id.* (quoting *Mayes v. Rapoport*, 198 F.3d 457, 461 (4th Cir.1999)). However, if the court finds that the joinder was not fraudulent and therefore it lacks subject matter jurisdiction over the removed action, the matter must be remanded to state court. *Id.* (citing 28 U.S.C. §1447(c)). In making this determination, the Court may look beyond the pleadings to identify indicia of fraudulent joinder. *Id.* at 219 (citing *Abels v. State Farm Fire & Cas. Co.,* 770 F.2d 26 (3d Cir. 1985)). However, in doing so, the court of appeals cautioned that a "district court must not step 'from the threshold jurisdictional issue into a decision on the merits.'" *Id.* (citing *Boyer,* 913 F.2d at 112; *Batoff v. State Farm Ins. Co.,* 977 F.2d 848, 852 (3d Cir. 1992)).

The court of appeals has delineated the following standards to be applied in a fraudulent joinder analysis:

> [T]he removing party carries a heavy burden of persuasion in [demonstrating fraudulent joinder]. It is logical that it should have this burden, for removal statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.
>
> Joinder is fraudulent where there is no reasonable basis in fact or colorable ground supporting the claim against the joined

defendant, or no real intention in good faith to prosecute the action against the defendants or seek a joint judgment. But, if there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court....

In evaluating the alleged fraud, the district court must focus on the plaintiff's complaint at the time the petition for removal was filed. In so ruling, the district court must assume as true all factual allegations of the complaint. It also must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff.

*Id.* at 217 (quoting *Batoff,* 977 F.2d at 852). In other words, joinder will not be considered fraudulent unless the claims against the non-diverse party can be deemed "'wholly insubstantial and frivolous'[.]" *Id.* at 218.

The court's inquiry into a fraudulent joinder claim is less demanding than the inquiry undertaken in ruling on a motion to dismiss under Rule 12(b)(6)—"simply because a claim against a party may ultimately be dismissed for failure to state a claim does not necessarily mean that the party was fraudulently joined." *In re Diet Drugs Prods. Liab. Litig.,* 294 F.Supp. 2d 667, 673 (E.D.Pa. 2003) (citing *Batoff,* 977 F.2d at 852) (other citation omitted). "[T]he same principles of fraudulent joinder apply where a plaintiff is improperly joined with another plaintiff to defeat diversity jurisdiction." *Id.* (citing *Tapscott v. M.S. Dealer Service Corp.*, 77 F.3d 1353, 1360 (11th Cir.1996) (*overruled on other grounds*); *In re Benjamin Moore & Co.*, 309 F.3d 296, 298 (5th Cir.2002); *In re Diet Drugs Prods. Liab. Litig.*, Civ. A. No. 98-20478, 1203, 1999 WL 554584 (E.D.Pa. July 16, 1999)).

# III.    DISCUSSION

## A.    Standing to Bring Suit as Third Party Beneficiary

In support of their motion to remand, Plaintiffs submit that Mylan Institutional has standing to bring this lawsuit as it is an intended third party beneficiary of the Consulting Agreement.    The Consulting Agreement contains a choice of law provision designating Pennsylvania law as the governing law.

The Pennsylvania Supreme Court has delineated two tests for determining whether a party attains third party beneficiary status.    Under the first test, "in order for a third party beneficiary to have standing to recover on a contract, both contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself."  *Scarpitti v. Weborg,* 609 A.2d 147, 149 (Pa. 1992) (citing *Spires v. Hanover Fire Ins. Co.,* 70 A.2d 828, 830-31 (Pa. 1950)).   Subsequently, the supreme court carved out an exception to the *Spires* rule in *Guy v. Liederbach,* 459 A.2d 744 (1983),[4] which comprises the second test. *Scarpitti,* 609 A.2d at 149. In so doing, the supreme court adopted the Restatement (Second) of Contracts, §302 (1979), which provides:

> Intended and Incidental Beneficiaries
>
> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

---

[4] In *Guy,* the Pennsylvania Supreme Court overruled *Spires* to the extent that it stated the exclusive test for third party beneficiaries.  *Guy v. Liederbach,* 459 A.2d 744, 751 (Pa. 1983).

(2) An incidental beneficiary is a beneficiary who is not an
　　　　　intended beneficiary.

*Id. See also Guy,* 459 A.2d at 751; *Scarpitti,* 609 A.2d at 150.  Thus, under the Restatement test,

courts must conduct a two-part inquiry for determining whether a party can be designated as an

intended third party beneficiary:

　　　　　(1) the recognition of the beneficiary's right must be "appropriate
　　　　　to effectuate the intention of the parties," and (2) the performance
　　　　　must "satisfy an obligation of the promisee to pay money to the
　　　　　beneficiary" or "the circumstances indicate that the promisee
　　　　　intends to give the beneficiary the benefit of the promised
　　　　　performance."

*Guy,* 459 A.2d at 751; *Scarpitti,* 609 A.2d at 150 (quoting *Guy, supra*).  Part one of the inquiry

addresses standing and vests discretion in the court to ascertain whether recognition of third

party beneficiary status would be appropriate.  *Id.*  The second part of the inquiry identifies the

two types of claimants who may be intended as third party beneficiaries.  *Id.*

　　　　The *Scarpitti* court rejected the argument that *Guy* was intended to apply only to cases

sufficiently similar on the facts, and held that so long as the requirements of §302 have been met,

nothing in *Guy* precluded the plaintiffs-appellees from being included in the narrow class of third

party beneficiaries envisioned by the supreme court.  609 A.2d at 150.  The supreme court in

*Scarpitti* thus summarized the law on third party beneficiaries in Pennsylvania:

　　　　　Accordingly, we hold that a party becomes a third party
　　　　　beneficiary only where both parties to the contract express an
　　　　　intention to benefit the third party in the contract itself, *Spires,*
　　　　　*supra, unless,* the circumstances are so compelling that recognition
　　　　　of the beneficiary's right is appropriate to effectuate the intention
　　　　　of the parties, and the performance satisfies an obligation of the
　　　　　promisee to pay money to the beneficiary or the circumstances
　　　　　indicate that the promisee intends to give the beneficiary the
　　　　　benefit of the promised performance. *Guy, supra.*

*Id.* at 150-51. Thus, even where, as here, the agreement does not expressly provide that the third party is intended to be a beneficiary, under the Restatement test enunciated in *Guy*, a party may still be a third party beneficiary. However, as the superior court pointed out in *Burks v. Federal Insurance Company,* "*Guy* did not alter the requirement that in order for one to achieve third party beneficiary status, that party must show that *both* parties to the contract so intended, and that such intent was within the parties' contemplation at the time the contract was formed." *Burks v. Federal Ins. Co.,* 883 A.2d 1086, 1088 (Pa. Super. Ct. 2005) (emphasis in original).

In the case at bar, Plaintiffs submit that under either the *Spires* standard or the more lenient Restatement standard, they have more than a "reasonable basis in fact or colorable ground supporting the claim" that Mylan Institutional has standing to sue Zorich for breach of contract. In support, Plaintiffs contend that the expressed intent of the parties (to benefit Mylan Institutional) is demonstrated through the references in the Consulting Agreement to (1) Mylan's acquisition of Bioniche, which is made more significant by the fact that Zorich was Bioniche's President of North America operations and Bioniche would later become Mylan Institutional; (2) Zorich's duties vis a vis the "Mylan Companies" (i.e., Mylan and its affiliate companies and subsidiaries); and (3) to the "Mylan Companies" in the confidentiality, non-compete and non-solicitation provisions of the Consulting Agreement. (Pls.' Br. in Supp. Mot. to Remand at 9-11, ECF No. 4.) Thus, according to Plaintiffs, by the language in the Consulting Agreement, which imposes obligations on Zorich to the Mylan Companies and which affords the Mylan Companies protection against unfair competition, Mylan and Zorich clearly indicated their mutual intention

that Mylan's affiliates, including Mylan Institutional,[5] benefit from the Consulting Agreement. Therefore, Plaintiffs submit that under Pennsylvania law, Mylan Institutional is a proper party to this lawsuit.

In response, Zorich argues that Mylan Institutional lacks standing to bring a breach of contract claim based on the Consulting Agreement because it does not qualify as a third party beneficiary under either the *Spires* or Restatement standard. Zorich devotes a good portion of his brief arguing why Mylan Institutional does not qualify as a third party beneficiary under the *Spires* test. The Court agrees with Zorich that, under the *Spires* test, Mylan Institution does not qualify as a third party beneficiary. Neither Bioniche nor any successor entity[6] is expressly designated as a third party beneficiary in the Consulting Agreement.

However, the Court disagrees with Zorich's conclusion that Mylan Institutional also fails to qualify as a third party beneficiary under the Restatement test officially adopted in *Scarpitti*. In support of his position, Zorich argues that there are no unique or compelling circumstances here that would justify recognizing Mylan Institutional as a third party beneficiary of the Consulting Agreement. Zorich contends that Mylan and Zorich were the only parties to the Consulting Agreement and Mylan, as signatory on the Consulting Agreement, clearly derived the benefits of Zorich's obligations under the agreement and is attempting to enforce the Consulting Agreement by way of this action.

---

[5] Plaintiffs maintain that Mylan Institutional is the current name of what was then still known as Bioniche, and Mylan's acquisition of Bioniche is specifically referenced in the recitals of the Consulting Agreement. (Pls.' Br. in Supp. Mot. to Remand at 11, ECF No. 4.)

[6] Zorich further argues that Mylan Institutional is not a third party beneficiary because it is a successor entity of Bioniche and did not even exist at the time Zorich entered into the Consulting Agreement. While this argument has some appeal at first blush, it misses the mark. The fact that Mylan Institutional did not exist at the time the Consulting Agreement was executed is irrelevant. Rather, what is relevant is whether the agreement expressly states that Bioniche *or any successor entity* be designated as a third party beneficiary. Because the agreement fails to contain any such language, the *Spires* test has not been met.

As a preliminary matter, the Court finds that Zorich has misstated the Restatement test. Plaintiffs need not prove that "unique or compelling circumstances that would justify recognizing Mylan Institutional as a third party beneficiary." Rather, under the Restatement test, Plaintiffs must show that recognition of Mylan Institutional's right to performance under the Consulting Agreement is appropriate to effectuate the intent of the parties, and the circumstances indicate that Mylan (as promisee) intended to give Mylan Institutional (beneficiary) the benefit of Zorich's promised performance. *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 168 (3d Cir. 2008) (applying Pennsylvania law and citing Restatement (Second) of Contracts, §302). Applying this test to the case at bar, the Court finds that Mylan Institutional is an intended beneficiary of the Consulting Agreement between Mylan and Zorich.

The following circumstances compel this conclusion. First, the Consulting Agreement clearly contemplated that Zorich's consulting services were necessary for the acquisition of Bioniche. In this regard, the Consulting Agreement expressly provides that the basis for the agreement is the intended acquisition of Bioniche by Mylan "or one of its affiliates." (Consulting Agmt., Recitals at 1, ECF No. 1-2 at 18.) In addition, the Consulting Agreement provides that Mylan's agreement to retain Zorich was contingent upon the consummation of the acquisition of Bioniche, referred to as the "Closing," and was to commence on the date of the Closing. (Consulting Agmt., ¶1 at 1, ECF No. 1-2 at 18.)

Second, the Consulting Agreement also contemplated that Zorich's performance under the agreement would benefit the "Mylan Companies," which includes Mylan Institutional, the successor entity of Bioniche. In this regard, the Consulting Agreement expressly provides that Zorch agreed to devote his full working time and attention to the business and affairs of Mylan "and its affiliate companies and subsidiaries (collectively, the 'Mylan Companies')[.]" (*Id.*) In

13

performing his duties as Consultant under the Consulting Agreement, Zorich agreed to "serve [Mylan] faithfully and to the best of [his] ability, and use [his] best efforts to promote the interests of the Mylan Companies." (*Id.*) Zorich also agreed that for 24 months after the termination of the Consulting Agreement, he would not become employed by a business that competes with the business or products of any of the Mylan Companies, nor would he solicit any clients or employees of the Mylan Companies. (*Id.* at ¶5(a)-(c) at 4-5, ECF No. 1-2 at 21-22.)

In addition to the Consulting Agreement, factual allegations in the Complaint support the conclusion that the contracting parties intended that Bioniche and/or its successor entity would be the primary beneficiary of the performance of the Consulting Agreement. Specifically, the Complaint alleges that Mylan was induced to acquire Bioniche based, in part, on Zorich's agreement to enter into the Consulting Agreement. (Compl., ¶11.) The Complaint further asserts that Zorich was Bioniche's President of North American operations at the time of its acquisition by Mylan. (*Id.*) As part of the SPA, Zorich agreed to enter into the Consulting Agreement with Mylan. (*Id.*) Mylan Institutional, a subsidiary of Mylan, was formed post-acquisition to operate the business of Bioniche. (*Id.* at ¶¶10, 33.) The majority of Zorich's consulting duties under the Consulting Agreement involved work for Mylan Institutional. (*Id.* at ¶33.) Moreover, although not asserted in the Complaint, Plaintiffs and Zorich refer to Mylan Institutional as the "successor entity" to Bioniche in their motions and/or briefs. (*See, e.g.,* Def.'s Resp. to Pls.' Mot. to Remand at 6, ECF No. 8; Pls.' Reply Br. at 4, ECF No. 13.)

These facts, when coupled with the above identified provisions in the Consulting Agreement, indicate that at the time of contracting, the parties intended that Bioniche, or its successor entity, benefit from the performance of the Consulting Agreement. Zorich's promised

performance was necessary to operate the business of Bioniche post-acquisition and of Mylan Institutional, as the successor entity.

The supreme court's decision in *Scarpitti* supports this conclusion. In *Scarpitti,* subdivision homeowners sued the architect retained by the subdivision developer to review and approve construction plans, seeking damages for his arbitrary enforcement of subdivision restrictions. The trial court dismissed the owners' complaint. Affirming the superior court's reversal, the supreme court held that the homeowners had a cause of action as intended third-party beneficiaries of the implied contract between architect and developer. 609 A.2d at 151. With regard to the first prong of the Restatement test, the supreme court found that recognition of a right to uniform enforcement of the restrictions in the homeowners was appropriate to effectuate the intent of the parties, even though the agreement between the architect and developer did not expressly manifest an intent to benefit the subdivision homeowners. *Id.* In so holding, the supreme court reasoned that the purpose of the contract between the architect and subdivision developer was to make the lots more attractive to prospective purchasers by requiring compliance with the restricted covenants. Consequently, the court found the third party beneficiary relationship was within the contemplation of the contracting parties at the time the contract was entered into. In this regard, the court further found that the future homeowners had the greatest interest in uniform enforcement of the restrictions and primarily benefited from the establishment of the vehicle to enforce the restrictions, i.e., the developer's retention of the architect to review the building plans of prospective lot owners. The court thus concluded that the homeowners reasonably relied upon the promise as manifesting an intention to confer a right on them. *Id.*

Similarly here, at the time the Consulting Agreement was entered into, Mylan and Zorich contemplated that Bioniche and/or its successor entity would be an intended beneficiary to the Consulting Agreement, because the agreement was predicated upon Mylan's acquisition of Bioniche and Zorich's promise to provide consulting services to the business entity or entities within the Mylan Companies which operated the business of Bioniche post-acquisition. As such, Bioniche and/or its successor entity had the greatest interest in Zorich's performance of his duties under the agreement and primarily benefited from Zorich's promise to faithfully provide his consulting services to the Mylan Companies. Therefore, it was reasonable for Mylan Institutional to rely upon Zorich's promise as manifesting an intention to confer a right of performance on Mylan Institutional. Accordingly, the circumstances here are at least as compelling as those in *Scarpitti* such that this Court has no trouble concluding that recognition of Mylan Institutional's right to performance under the Consulting Agreement is appropriate to effectuate the intent of the parties.

As to the second prong of the Restatement test, the *Scarpitti* court held that by establishing a vehicle for enforcing the restrictions, the architect and developer clearly intended to benefit the homeowners who purchased lots in the subdivision at the time they entered into the contract. In reaching this conclusion, the court noted that the architect promised to enforce the restrictions, which carried out the developer's intent that the homeowners benefit from the architect's performance. *Id.* Of particular relevance here, the court opined that "[a]lthough not specifically named, [the homeowners] were part of a limited class of persons intended to benefit from the agreement between [the architect] and [the developer], thus satisfying the second prong of *Guy* and subsection (b) of §302 Restatement (Second) of Contracts (1979)." *Id.* at 151.

Likewise in the case at bar, by establishing the Consulting Agreement, Mylan and Zorich clearly intended to benefit the business entity or entities within the Mylan Companies which operated the business of Bioniche post-acquisition. One such entity is Mylan Institutional. Even though Mylan Institutional was not named in the Consulting Agreement, as it did not yet exist, it was part of a limited class of companies intended to benefit from the agreement between Mylan and Zorich. *Scarpitti,* 609 A.2d at 151; *cf. Sovereign Bank,* 533 F.3d at 172-73 (holding that issuer of VISA bank card was intended beneficiary of contract between VISA and bank wherein bank promised VISA that it would ensure that merchants complied with the provision of the member agreement prohibiting merchants from retaining cardholder information. Court of appeals noted that the fact that VISA intended to benefit several members or classes of members did not negate the possibility that it intended to benefit individual issuers such as plaintiff.) Therefore, under *Scarpitti,* the second prong of the Restatement test has been satisfied here.

Zorich argues that just because he owed obligations to the "Mylan Companies" does not mean that each and every one of Mylan's affiliates is a third-party beneficiary of the Consulting Agreement. In support, Zorich cites *Marsteller Cmty. Water Auth. v. P. J. Lehman Eng'rs,* 605 A.2d 413, 416 (Pa. Super. Ct. 1992), for the proposition that "the fact that the obligee knows that he will perform the contracted-for services for a third party is not, in itself, sufficient to vest the third party with standing to sue on the contract." However, Zorich's reliance on *Marsteller* is misplaced for several reasons. First, the superior court applied the *Spires* test in ascertaining whether Marsteller had standing to bring suit as a third party beneficiary. The superior court never even mentioned the supreme court's decision in *Guy,* and *Scarpitti* had not yet been decided at the time of the superior court's decision in *Marsteller.* Second, the language cited by Zorich is taken out of context, as a close review of the opinion reveals that the superior court was

distinguishing the *Spires* test from the situation in *Manor Junior Coll. v. Kaller's Inc.,* 507 A.2d 1245 (Pa. Super. Ct. 1986), in which the superior court found that a third party lacked standing to bring a cause of action for breach of a *verbal* contract. *Marsteller,* 605 A.2d at 416. Finally, the superior court ultimately concluded in *Marsteller* that based on the averments in the complaint and numerous references to Marsteller in the agreement and in a separate report that was integral to the agreement, Marsteller was an intended beneficiary of the contract. *Id.* Thus, the superior court's decision in *Marsteller* actually favors Plaintiffs' position here, not Zorich's.

Zorich further argues that the fact that Mylan Institutional is not named in the Consulting Agreement or was not in existence at the time the agreement was executed supports the conclusion that it was not an intended beneficiary. The Court disagrees for the reason set forth above in its analysis of the similarities between this case and *Scarpitti*—even though Mylan Institutional was not named in the Consulting Agreement, as it did not yet exist, it was part of a limited class of Mylan Companies intended to benefit from the agreement between Mylan and Zorich. *Scarpitti,* 609 A.2d at 151; *cf. Sovereign Bank,* 533 F.3d at 172-73. Zorich and Mylan anticipated that there would be a successor entity to Bioniche at the time of contracting, as evidenced by the statement in the Recitals section to the effect that Mylan or one of its affiliates would acquire Bioniche, and (2) by the use of the term Mylan Companies.[7] Thus, based on *Scarpitti,* the Court finds that although the name of the successor entity was not known at the time of contracting, that does not preclude the Court from finding that Mylan Institutional is an intended beneficiary of the Consulting Agreement.

---

[7] The fact that the parties chose to use the term "Mylan Companies" rather than identifying specific Mylan affiliates by name indicates that the parties intended that the Consulting Agreement would benefit not only Mylan affiliates in existence at the time of contracting, but also, other Mylan affiliates that would come into existence after the contract was entered into.

B.     **Fraudulent Joinder**

Essentially, Zorich argues that because Mylan Institutional lacks standing to sue for breach of the Consulting Agreement, that claim is "wholly insubstantial and frivolous." Thus, Zorich contends that Mylan Institutional was fraudulently joined as a plaintiff in this lawsuit solely to defeat diversity jurisdiction.  However, since this Court has determined that Mylan Institutional does have standing to sue for breach of contract as a third party beneficiary of the Consulting Agreement, Zorich's argument must fail.

In further support of his fraudulent joinder argument, Zorich submits that there is no apparent, legitimate reason why Mylan Institutional was named as a party to this action because the signatory to the agreement, Mylan, Inc., is listed as a party/plaintiff, both Plaintiffs are represented by the same counsel, allege identical facts and breach of contract claims against Zorich, and Mylan Institutional is not seeking to enforce any right or any relief that is separate or distinct from what Mylan seeks.  In fact, according to Zorich, the only consequence of adding Mylan Institutional as a plaintiff is it operates to defeat diversity jurisdiction.

Plaintiffs respond that Mylan Institutional is a party to this lawsuit for several reasons. First, during the term of the Consulting Agreement, Zorich provided consulting services exclusively to Mylan Institutional—Bioniche's corporate successor, which continued the injectable pharmaceutical business of Bioniche post-acquisition.  Second,  Zorich, as president and chief executive officer of W.G. Critical Care, is unfairly competing with Mylan Institutional and is in a position to utilize Mylan Institutional's confidential information and to its customers. Third, Bohling, an employee of Mylan Institutional whom Zorich recruited to work at W.G. Critical Care, allegedly downloaded approximately 40 gigabytes of Mylan Institutional's business information to use for the benefit of W.G. Critical Care.  Thus, Plaintiffs maintain that

Mylan Institutional is a party to this lawsuit to protect its own vital business interests which Zorich and Bohling have endangered by virtue of Zorich's unlawful competition with Mylan Institutional. (Pls.' Reply Br. at 4, ECF No. 13 at 4.)

Also Plaintiffs argue in response that the fact that Mylan and Mylan Institutional are asserting the same claim does not mean that one or both parties are improper plaintiffs or have been fraudulently joined. The Court agrees with Plaintiffs. Cases are routinely brought by multiple plaintiffs asserting identical claims against one or more defendants. The Court is not aware of any rule or case law authority that would preclude this practice, and Zorich fails to point to any such authority.

Plaintiffs next point out the flaw in Zorich's argument that based on their reasoning, Mylan would be able to defeat diversity jurisdiction "by adding any one of its affiliates to a complaint depending on where the defendant resided." (Def.'s Resp. to Mot. to Remand at 5 n. 1, ECF No. 8.) Zorich's argument has not merit as it ignores the additional requirement that in order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must have a factual and legal basis for its claim. Here, the Complaint does not name just any Mylan affiliate, but rather, names Mylan Institutional, which has standing to assert the breach of contract claim as a third party beneficiary. In addition, the Complaint contains allegations setting forth a factual and legal basis for Mylan Institutional's breach of contract claim against Zorich.

Finally, Plaintiffs counter that Mylan Institutional's claim is not insubstantial or frivolous, as Zorich's alleged breaches of the Consulting Agreement caused immediate and irreparable harm to Mylan Institutional, which was formed to carry on the injectable pharmaceutical business of Bioniche post-acquisition. Plaintiffs allege that the confidentiality of Mylan Institutional's proprietary business information was compromised by Zorich's actions and

resulted in a loss of Mylan Institutional's customers and customer goodwill. The Court agrees with Plaintiffs that Mylan Institutional's breach of contract claim is not wholly insubstantial or frivolous. As noted above, the Complaint sets forth a factual and legal basis for Mylan Institutional's breach of contract claim against Zorich. Therefore, the Court cannot find that "no reasonable basis in fact or colorable ground supporting [Mylan Institutional's] claim" exists here.

Because Zorich has failed to prove that Mylan Institutional's claim against him is "wholly insubstantial and frivolous," he has not met his burden of showing that Mylan Institutional was fraudulently joined as a plaintiff in this lawsuit solely to defeat this Court's diversity jurisdiction. Accordingly, this Court lacks subject matter jurisdiction over this action and will order that this case be remanded to state court.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that remand is appropriate because Defendant has failed to prove that the Plaintiffs fraudulently joined Mylan Institutional in order to preclude diversity of citizenship. An appropriate order will follow.

Dated: February 16, 2012                    BY THE COURT:

                                            _____
                                            LISA PUPO LENIHAN
                                            Chief United States Magistrate Judge

cc:    All Counsel of Record
       *Via Electronic Mail*